FIRST MINNESOTA BANK, f/k/a First
Minnesota Bank, N.A., Appellant,

v.

OVERBY DEVELOPMENT, INC.,
et al., Respondents,

Great Woods Cabinetry, Inc.,
et al., Defendants.

No. A09–1708.

Court of Appeals of Minnesota.

June 15, 2010.

Thomas G. Wallrich, Thomas J. Radio, Heather L. Marx, Hinshaw & Culbertson LLP, Minneapolis, MN, for appellant.

C. Alden Pearson, C. Alden Pearson, P.A., Vadnais Heights, MN, for respondents.

Considered and decided by
KALITOWSKI, Presiding Judge;
MINGE, Judge; and HARTEN, Judge.*

## OPINION

MINGE, Judge.

This dispute is about the disposition of a surplus arising from a mortgage foreclosure. Appellant-mortgagee argues that (1) the district court misread this court's prior opinion and misidentified the law to be applied on remand; (2) under Minn.Stat. § 581.06, respondents-mortgagors are not entitled to any surplus so long as any part of the debt under the loan contract is unpaid; (3) the security interest granted in the loan contract extends to any surplus due respondents in a foreclosure sale; and (4) the facts of this case entitled appellant to any surplus. We affirm.

## FACTS

To finance development of numerous lots of real estate that it owned, respondent Overby Development, Inc. borrowed $3,600,000 from appellant First Minnesota Bank, and entered into a loan contract that granted appellant a mortgage against the lots and a security interest in "all rights and interests related" to the mortgaged lots as collateral for the loan.[1] Respondent Wayne Overby had organized Overby Development, Inc. and personally guaranteed its obligations to appellant.

Respondents defaulted, and appellant brought an action to foreclose the mortgage under Minnesota Statutes chapter 581. Appellant's foreclosure action included most, but not all, of the lots that had been originally mortgaged to secure the loan.[2] Appellant moved for summary judgment. At the summary judgment hearing, respondents admitted that they were in default, but noted that some of the lots that appellant sought to foreclose on had already been sold or had pending sales. Appellant responded that it was willing to work with respondents to craft the summary judgment order (Foreclosure Order). Respondents and appellant prepared a stipulated Foreclosure Order, which the judge signed. This stipulated Foreclosure Order excluded certain lots from the action and subtracted from the judgment the mortgage principal and interest allocated to those excluded lots.[3] The resulting stipulated Foreclosure Order (1) awarded judgment against respondents in the sum of $3,396,051.37, which represented part of the outstanding principal amount of the loan, interest, fees and costs; (2) granted a judgment of foreclosure in that amount; and (3) ordered the sale of the agreed-upon lots at public auction.

---

* Retired judge of the Minnesota Court of Appeals, serving by appointment pursuant to Minn. Const. art. VI, § 10.

1. The mortgage was secured by lots 1–48 and Outlot A of the Waters Edge Property and by lots 1–11, 13–21, and 23–27 of the Lake Circle Property.

2. The following lots were never a part of this foreclosure action: 5, 12, 37, 41, 47, 48 and Outlot A of the Waters Edge Property. Respondents had sold most of these lots and obtained a release from the mortgage lien for these sold lots according to the partial-release clause in the mortgage. This clause allowed respondents to sell individual lots in the property, required sale proceeds to be applied to the balance due on the note, and required appellant to release the sold lots from the mortgage lien. The mortgage agreement included this language because the parties contemplated that respondents would be selling lots individually.

3. Specifically, because of pending sales, the parties agreed to exclude lots 11 and 23 of the Lake Circle Property and the corresponding mortgage interest and principal from the foreclosure action.

The sheriff held a public auction. Appellant was the sole bidder and bid $274,898.30 in excess of the debt it had allocated to the foreclosed lots as set forth in the stipulated Foreclosure Order award. This excess included debt allocated to (1) the lots that were originally a part of the foreclosure action but which the parties later agreed to exclude; and (2) yet other lots that had never been part of the action.

Appellant moved to confirm the sale. A dispute arose over who was entitled to the surplus generated by the overbid and whether the judgment against respondents was satisfied by the foreclosure sale. Appellant contended that there was no surplus within the meaning of Minn.Stat. § 581.06 because a portion of the mortgage amount was still outstanding and the judgment was not for the entire indebtedness secured by the mortgage. Respondents argued that the judgment against them was satisfied by the foreclosure sale and that, absent other lien holders, the overbid was a surplus to which they were entitled.

The district court ruled that respondents were entitled to the amount of the overbid and to a satisfaction of the judgment against them. The bank appealed to this court. In our March 2009 decision, we held that the judgment against respondents was satisfied by the foreclosure sale. *First Minn. Bank v. Overby Dev., Inc.,* No. A08–0813, 2009 WL 749583, at *2–3 (Minn.App. Mar. 24, 2009). We reasoned that the judgment awarded in the stipulated Foreclosure Order was the entire basis of the action and that, while appellant may still be owed some amounts under its mortgage, those amounts were not relevant because they corresponded to parcels that the parties had agreed to exclude from the action. *Id.* However, we reversed and remanded to the district court on the issue of whether appellant's overbid produced a surplus within the meaning of Minn.Stat. § 581.06 to which the respondents were entitled. *Id.*

On remand, the district court confirmed its prior decision that appellant's bid produced a surplus under Minn.Stat. § 581.06 and that respondents were entitled to this surplus. The district court reasoned (1) that the phrase "mortgage debt" in section 581.06 was synonymous with the dollar amount of the judgment entered in foreclosure-by-action proceedings; (2) that because the amount appellant bid was undisputedly greater than this judgment amount, a surplus existed; and (3) that respondents were entitled to the surplus. The district court denied appellant's motion for reconsideration. This appeal followed.

After filing this appeal, appellant also initiated another action in district court to foreclose on the portions of the mortgage corresponding to three lots that were not part of its prior foreclosure action.

## ISSUES

I. Is appellant's appeal timely?

II. Do appellant's arguments constitute a collateral attack on this court's March 2009 decision?

III. Minn.Stat. § 581.06 states that a bid in a foreclosure sale results in a surplus if, "after satisfying the mortgage debt," there is money left over from the bid. Is the phrase "after satisfying the mortgage debt" limited to that portion of the mortgage debt that a court by stipulated order allocates to the specific lots subject to the foreclosure action?

IV. Notwithstanding the provisions of the statute, does the loan contract grant appellant a security interest in the surplus?

V. Notwithstanding the provisions of the statute, is appellant entitled to the surplus on equitable grounds?

## ANALYSIS

### I.

■ The first issue is whether this appeal is timely. Minn. R. Civ.App. P. 104.01, subd. 1, provides that an appeal from an appealable order must be taken "within 60 days after service by any party of written notice of its filing." Respondents argue that a June 22, 2009 letter they sent to appellant served as a notice of filing under rule 104.01 and thus started the 60–day time limit to appeal.

In *Levine v. Hauser,* this court held that a party's letter did not constitute such a written notice of filing when the letter made no reference to the filing of the order, did not give the date of filing, did not indicate that notice was being served to limit the time for appeal, and was not captioned as a notice of filing or prepared specifically for that purpose. 431 N.W.2d 269, 270 (Minn.App.1988). Here, respondents' letter, like the letter in *Levine,* does not indicate that it was a notice being served to limit the time for appeal and was not prepared specifically for that purpose. Rather, respondents' letter announces its purpose thusly: "This letter is our effort to resolve this matter pursuant to Minn. R. [Gen.] P. 115.10 prior to bringing the aforementioned [motion to the district court requesting that appellant show cause why it has not paid the disputed surplus into the district court]." Also like the letter in *Levine,* the letter here does not specifically refer to the filing of the district court's order. It merely attaches the district court documents and states: "[P]lease find the Notice of Filing Order and Order and Memorandum respectively dated June 18, 2009, and June 16, 2009." The only difference between the letter here and the letter in *Levine* is that the letter here does give the dates of the district court documents. But it does not note that these dates are the dates the documents were filed by the district court.

Based on the similarities of the letter here to the letter in *Levine,* we conclude that respondents' letter does not have sufficient specificity to provide a notice of filing under rule 104.01 and does not limit the time for appeal of the district court's June 16, 2009 order. Because there was no other document served by either party that started the running of the 60–day time limit to appeal, appellant's appeal is timely. *See Curtis v. Curtis,* 442 N.W.2d 173, 176 (Minn.App.1989) (ruling that because no notice of filing was served, the time to appeal did not start running).

### II.

■ The other threshold issue is whether appellant collaterally attacks this court's March 2009 decision. Respondents argue that appellant collaterally attacks this court's prior decision in two ways: (1) by implying that a surplus only exists for purposes of section 581.06 if there is money remaining after satisfying the entire underlying mortgage debt; and (2) by arguing that the district court misidentified the governing law when it applied Minn. Stat. § 581.08 (2008) on remand.

■ A valid judgment may not be collaterally attacked. *Fidelity & Deposit Co. of Md. v. Riopelle,* 298 Minn. 417, 421–22, 216 N.W.2d 674, 677 (1974). In the context of this case, this rule means that issues determined in this court's March 2009 decision may not be litigated in the district court on remand nor reexamined in this second appeal; these issues may only be litigated by directly appealing this court's March 2009 decision to the supreme court. *See id.; Mattson v. Underwriters at*

*Lloyds of London,* 414 N.W.2d 717, 719–21 (Minn.1987) (explaining "law of the case" doctrine). But issues that were not determined in this court's March 2009 decision can be litigated on remand. *See Mattson,* 414 N.W.2d at 720 (same).

In our March 2009 decision, we remanded for a determination of whether a surplus existed under Minn.Stat. § 581.06 to which respondents were entitled. When we remarked that "[i]t is possible that the term 'mortgage debt' in section 581.06 means precisely that," we did not foreclose the possibility that there might not be a surplus for purposes of section 581.06.[4] As a result, appellant's argument—namely, that a surplus does not exist under section 581.06 unless there is money remaining after satisfying the entire mortgage debt— is within the scope of an issue that could be litigated on remand.

Appellant is also not collaterally attacking this court's prior decision by arguing that on remand the district court misidentified the governing law when it applied section 581.08. Appellant argues that the district court erred by applying this section because it is not the section of the statutes that determines which party is entitled to the surplus. Because we remanded for a determination of which party is entitled to any surplus under section 581.06, we conclude that appellant's present claim is within the scope of an issue that could be litigated on remand.

### III.

■ Minn.Stat. § 581.06 states that a bid in a foreclosure sale results in a surplus if, "after satisfying the mortgage debt," there is money left over from the bid. The next issue is whether the phrase "after satisfying the mortgage debt" means that the entire amount of the mortgage debt must be satisfied before there is a surplus, or only that portion of the debt allocated to the property subject to the foreclosure action. The interpretation of a statute is a question of law that we review de novo. *Reider v. Anoka–Hennepin Sch. Dist. No. 11,* 728 N.W.2d 246, 249 (Minn. 2007). But we do not set aside a district court's findings of fact unless those findings are clearly erroneous. *Fletcher v. St. Paul Pioneer Press,* 589 N.W.2d 96, 101 (Minn.1999).

In interpreting statutes, courts must "ascertain and effectuate the intention of the legislature." Minn.Stat. § 645.16 (2008). Courts construe words according to their "common and approved usage." Minn.Stat. § 645.08(1) (2008). The first question in statutory interpretation is whether the statute is ambiguous. *Am. Tower, L.P. v. City of Grant,* 636 N.W.2d 309, 312 (Minn.2001). The language of a statute is ambiguous if more than one reasonable interpretation exists. *Id.* If the language of a statute is plain and unambiguous, then courts must interpret the statute as written without applying other principles of statutory construction. *Id.*

In a foreclosure by action, Minn.Stat. § 581.06 determines whether a surplus exists and how that surplus should be distributed:

> When the sale is for cash, if, after satisfying the mortgage debt, with costs and expenses, there is a surplus, it shall be brought into court for the benefit of the

---

**4.** This court held that the overbid amount produced a surplus when measured against the judgment amount, but this is not necessarily the same thing as there being a surplus for purposes of section 581.06 because that section uses the phrase "mortgage debt" instead of judgment. The parties seem to gloss over this distinction in their briefs, both noting that a surplus existed. The key question is not whether there was a *surplus* in the ordinary sense of the term, but whether there was a *surplus* under section 581.06.

mortgagor or the person entitled thereto, subject to the order of the court. The surplus money is not money to which the mortgagee generally has any claim. *See Babcock v. Am. Savings Loan Ass'n,* 67 Minn. 151, 152, 69 N.W. 718, 718 (1897) (noting that the mortgagor is entitled to a surplus resulting from a foreclosure sale even if the bid is from the mortgagee).

The core of appellant's argument is that appellant is entitled to the surplus because, even after the foreclosure sale, respondents still owe appellant money under the loan contract of which the mortgage is a part. It is undisputed that appellant foreclosed on some—but not all—of the property for some—but not all—of the mortgage debt. Appellant claims that the "mortgage debt" under section 581.06 means the entire debt secured by the entire mortgage, not just the portion of mortgage debt that is foreclosed.

Although no statute or caselaw is directly on point, the supreme court's decision in *Shaw Acquisition v. Bank of Elk River* provides some guidance on this issue. 639 N.W.2d 873 (Minn.2002). In *Shaw,* a bank had a mortgage on property that was being developed.[5] *Id.* at 874–75. The bank made advances to finance construction. *Id.* at 875. After the bank had advanced some money, but before it had advanced all of the money, a mechanic's lien attached for work done by a contractor. *Id.* When the contractor sought to foreclose its mechanic's lien, the bank and the contractor agreed to split the priority of the bank's mortgage. *Id.* The approximately $98,000 the bank had advanced before the contractor filed its mechanic's lien had

first priority, the contractor's mechanic's lien had second priority, and the approximately $112,000 the bank advanced after the contractor filed its mechanic's lien had third priority. *Id.* Later, the bank foreclosed on its mortgage by advertisement and bid approximately $245,000, which represented the total amount due under its first- and third-priority positions plus costs and interest. *Id.* at 875–76. The contractor sued to enforce its second-priority lien, alleging that the bank improperly withheld a surplus from the foreclosure. *Id.*

On appeal, the bank argued that under Minn.Stat. § 580.10 (2000), a surplus exists only if the entire mortgage is satisfied. *Id.* at 876. That section provides that there is a surplus if there is money left over "after satisfying the mortgage." Minn.Stat. § 580.10. The bank argued that its first and third positions were pursuant to a single mortgage with split priorities, which would mean that there was no surplus because there would be no money left after satisfying the mortgage debt. *Shaw,* 639 N.W.2d at 876–77. The supreme court rejected the bank's argument and affirmed the district court. *Id.* at 877–78. The court reasoned that section 580.10 "does not indicate that the term mortgage refers to the full 'mortgage' indebtedness" as the bank argued. *Id.* at 877. The court also relied on the parties' agreement, whereby the bank agreed that the mechanic's lien was senior to some of the mortgage indebtedness that the bank was owed. *Id.* at 878.

Here, appellant, like the bank in *Shaw,* argues that the statutory requirement that

---

5. In *Shaw,* there were two parcels of property and a separate, multi-advance mortgage for each parcel. 639 N.W.2d at 874–75. However, the parcels were developed simultaneously, the mortgages and notes were dated and recorded at the same time, draws on the notes were made at the same time, and improve-

ments to each parcel were made by the same mechanic's-lien claimant. *Shaw Acquisition Co. v. Bank of Elk River,* 627 N.W.2d 365, 366 (Minn.App.2001), *aff'd,* 639 N.W.2d 873 (Minn.2002). Because of this commonality, we have simplified our discussion of the *Shaw* case.

the mortgage debt must be satisfied before there is a surplus means that the *entire* mortgage must be satisfied before there is a surplus. Although the foreclosure in this case is by action, not by advertisement as in *Shaw,* the language of the relevant statutes is similar. *Compare* Minn.Stat. § 581.06 ("after satisfying the mortgage debt") *with* § 580.10 ("after satisfying the mortgage"). We attribute no legal significance to the presence of the word "debt" in section 581.06. Although appellant here does not have a split-priority mortgage, appellant, like the bank in *Shaw,* reached an agreement with another party over allocation of its mortgage debt. Here, the agreement provided that appellant would only foreclose on certain lots, rather than all the lots included in the mortgage and that appellant would determine the mortgage debt it wished to allocate to the foreclosure to make that debt proportional to the lots being foreclosed upon.

Based on this agreement and the supreme court's interpretation of "mortgage" in section 580.10, the better interpretation of the phrase "mortgage debt" in section 581.06 is that it refers to the portion of the mortgage debt on which the lender actually forecloses. Put another way, "mortgage debt" in that section means the debt corresponding to and secured by the property that is sold at the foreclosure sale. Here, pursuant to the stipulated Foreclosure Order, appellant agreed that the district court judgment represented the debt for the property that was foreclosed on.[6] Since appellant's bid was greater than the mortgage debt allocated to the foreclosure action, a surplus exists. And this surplus is separate from the debt that respondents still owe appellant. By stipulation, that remaining debt is allocated to and secured

by other lots that appellant chose not to foreclose upon.

Moreover, adopting appellant's interpretation of section 581.06 could lead to absurd results. Under its interpretation, a mortgagee could foreclose on less than all the lots secured by a mortgage, obtain a judgment for the mortgage debt corresponding to the foreclosed lots, but still bid an amount equal to the mortgage debt for all of the lots securing the mortgage (i.e., the entire mortgage debt). But because a higher bid at a foreclosure sale makes redemption more costly, a mortgagee under appellant's interpretation of section 581.06 could, by overbidding, manipulate the foreclosure process, obtain ownership of properties, retain a "surplus," and frustrate a mortgagor's or junior lien holder's right of redemption. Such a manipulative result would be absurd. When interpreting statutes, courts presume that the legislature does not intend absurd results. Minn.Stat. § 645.17(1) (2008).

In sum, we conclude that because section 581.06 provides that the surplus should be distributed to either "the mortgagor or the person entitled thereto," and because the record does not disclose any other party besides respondents (the mortgagors) who would be entitled to this money, the district court did not err in determining that the surplus should be paid to respondents.

## IV.

The next issue is whether the loan contract grants appellant a security interest in the surplus. In claiming the surplus, appellant points to various terms of the parties' loan contract that constitute a security agreement granting appellant a security interest in the following as collateral for its loan:

6. The monetary judgment in the Foreclosure Order for the breach of the loan contract was

$3.396 million, which included principal, interest, late fees, and attorney fees and costs.

all hereditaments, easements, appurtenances, estates, rents issues, profits, condemnation awards and other rights and interests now or hereafter related to the Loan property, its improvement and use.

Whether this provision, together with other portions of the loan contract and the law governing secured transactions, establish a lien on the surplus otherwise due respondents, is a question of law, which we review de novo.

This issue involves several fields of law. At the outset, the claim of a security interest requires consideration of the Uniform Commercial Code. Article 9 recognizes security interests in certain proceeds and accounts. Minn.Stat. § 336.9–203(f) (2008). Respondents do not dispute the general proposition that a creditor can have a security interest in proceeds, accounts, rights to payment, and funds of a debtor. However, the law of secured transactions limits the reach of a security interest in real estate. Minn.Stat. §§ 336.9–109(d)(11), .9–604(a) (2008). "Several cases have concluded that Article 9 security interests cannot be created in the proceeds of the sale of real estate." 1C Bender's Uniform Commercial Code Service § 16.02, at 16–6 (2009). Here, the claimed security interest in the surplus arises out of the foreclosure sale of a mortgage on respondents' real estate. The existence of this security interest is disputed.

Next, we note that appellant's claim arises from a stipulated mortgage foreclosure by court action. We have already considered that subject and concluded that because of the stipulated Foreclosure Order, the mortgage-foreclosure statutes grant the surplus to respondents. Caselaw provides that the mortgagee-lender cannot "clog" the mortgagor-borrower's right of redemption. *E.g.*, Restatement (Third) of Property Mortgages § 3.1 cmt.

(1997); Grant S. Nelson & Dale A. Whitman, *Real Estate Finance Law* § 3.1, at 37–43 (5th ed.2007). Although not directly applicable to the situation before us, the anticlogging principle has been applied in a variety of settings. Because the mortgagor's claim to the surplus from a foreclosure sale is an alternative to the right of redemption, a mortgagee-lender's efforts to utilize contract language to limit that right invites judicial scrutiny.

■ Legal principles regarding the effect of judgments on the antecedent claims that were the underlying basis for the judgments are also relevant to the issue of who receives the surplus. The law is settled that when a judgment is granted in favor of the plaintiff, the plaintiff's claim merges with the judgment and the plaintiff can maintain an action only on the judgment, not the claim. *Twenty Assocs. v. First Nat'l Bank & Trust Co.*, 200 Minn. 211, 219, 273 N.W. 696, 700 (1937); *Olson v. Dahl*, 99 Minn. 433, 438–39, 109 N.W. 1001, 1003 (1906); *see* Restatement (Second) of Judgments §§ 18 (discussing rule of merger), 24 (discussing scope of "claim" under rule of merger) (2009). The merger of the claim into the judgment effectively extinguishes the claim. The extinguished claim "includes all rights of the plaintiff to remedies against the defendant with respect to all or any part of the transaction, or series of connected transactions, out of which the action arose." Restatement (Second) of Judgments § 24(1); *accord Twenty Assocs.*, 200 Minn. at 219, 273 N.W. at 700.

Our task is to analyze the record and properly apply the relevant legal principles to appellant's claimed security interest in the surplus. Here, the loan document that is entitled "Security Agreement" is also entitled "Mortgage." Its provisions are predominantly those of a real estate mort-

gage; the collateral is fundamentally real estate.

Contrary to appellant's argument, the language of the loan contract in this case does not create a separate, free-standing security interest in the surplus proceeds. Rather, the security interest is a function of the real estate. The contract references "other rights and interests ... related to the loan property, its improvement and use." Accompanying language references substitution of proceeds for mortgaged real estate in situations where the secured party would otherwise lose its collateral—examples are eminent domain or a natural disaster. Here, the mortgage debt allocated to the foreclosed parcels has been satisfied and appellant-mortgagee has not lost but instead actually owns the property. To say this security interest survives, granting a right to and interest in the surplus incident to the foreclosed property gives the security-agreement language an expansive effect. Such a reach would override the expectations of surplus disposition under the mortgage-foreclosure statutes and create a remedy in which the mortgagee would both acquire the real estate itself and have a lien on the surplus that it created with its own intentional overbid.

When appellant obtained a foreclosure judgment relating to certain parcels, this judgment eclipsed the contractual claims and became appellant's basis for relief as to these parcels. Appellant's reliance on the security-interest clause of the loan contract without regard to the mortgage foreclosure to argue it has a right to surplus produced from the sale of the foreclosed parcels is misplaced. Language in the mortgage clauses in the loan contract provides that the mortgage is released when the respondents pay the sums due under it. By its own choice, appellant allocated the debt secured to certain parcels being foreclosed upon.

As previously noted, appellant's claim of a free-standing security interest goes beyond the statutory remedies available to a mortgagee. By use of superior financial resources, mortgagees can orchestrate bidding to frustrate redemption. This calls to mind the limits imposed by the anticlogging rules previously mentioned.[7] Furthermore, appellant's claim would extend a security interest to proceeds from the sale of real estate. It would deprive mortgagors and junior lien holders of their rights to surplus funds resulting from foreclosure sales and marginalize the effect of section 581.06.

Based on the record and the foregoing analysis, we conclude that the loan document does not grant appellant a security interest in the surplus.[8]

## V.

■■■■ The final issue is whether appellant is entitled to the surplus on equitable grounds notwithstanding the provisions of the statute. "Granting equitable relief is within the sound discretion of the [district] court. Only a clear abuse of that discretion will result in reversal." *Nadeau v. County of Ramsey*, 277 N.W.2d 520, 524 (Minn.1979).

Appellant argues that even if it is not entitled to the surplus under the statute, it is entitled to the surplus on equitable

---

7. Although not directly relevant, we note that the rules regarding marshaling would have some relevance to the issue before us if a junior creditor was claiming the surplus. *See Nelson, Whitman* § 10.9, at 907–15 (discussing marshaling).

8. We are not presented with and do not address appellant's claim to the surplus as an unsecured creditor with any remedies available to such a creditor.

grounds. Appellant cites various cases granting equitable relief to the mortgagee where the mortgagee made some mistake during the foreclosure process. *Romkey v. Saumweber*, 170 Minn. 438, 439, 212 N.W. 816, 816 (1927) (observing that the mortgagee's attorney made a clear unilateral mistake by mistakenly identifying the lots being foreclosed and affirming equitable relief to mortgagee to fix the error); *Peterson v. First Nat'l Bank*, 162 Minn. 369, 371–72, 203 N.W. 53, 53–54 (1925) (affirming equitable relief where attorney for the mortgagee grossly underbid at a foreclosure sale because of a mistake); *Lane v. Holmes*, 55 Minn. 379, 382–84, 57 N.W. 132, 133 (1893) (affirming equitable relief where mortgagee's attorney mistakenly overbid during foreclosure sale); *Anderson v. Peterson's N. Branch Mill, Inc.*, 503 N.W.2d 517, 519 (Minn.App.1993) (affirming equitable relief where attorney for a foreclosing junior mortgagee mistakenly bid at foreclosure sale an amount that included the senior mortgage when the senior mortgagee had not foreclosed).

Here, there is no claim appellant as mortgagee faces a financial loss as a result of its bidding strategy. Appellant has consistently asserted that the amount of its bid at the foreclosure sale was intentional and not a mistake. Moreover, appellant agreed to exclude lots from the foreclosure action and, along with respondents, stipulated to the Foreclosure Order which allocated the mortgage debt. Appellant cannot claim that it was ignorant of the facts relating to the judgment and foreclosure. Neither can it claim that it is blameless as required by the *Peterson* holding. *See Peterson*, 162 Minn. at 369, 203 N.W. at 53 (noting plaintiff's blamelessness in syllabus by the court). A more analogous case is *Babcock*, where the lender's overbid at the foreclosure sale involved no mistake of fact, only a mistake of law, and "was deliberately adopted." 67 Minn. at 153, 69 N.W. at 718. In denying relief, the *Babcock* court noted that though "[t]he result of this litigation may be a hardship for the [mortgagee] ... it alone is to blame." *Id.* We conclude that the district court did not abuse its discretion in refusing to grant appellant equitable relief.

## DECISION

This appeal is timely and is not foreclosed by our March 2009 decision. Neither the statutory provision for allocating surplus generated by a foreclosure sale, nor the claimed security-interest provisions of the loan contract, nor equitable principles entitle appellant to retain the surplus resulting from its foreclosure bid. We affirm the decision of the district court.

**Affirmed.**